**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DEBORAH P. SHEAHAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 CV 5766** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Deborah Sheahan seeks judicial review under 42 U.S.C. § 405(g) of the

final decision of Defendant Commissioner of the Social Security Administration ("SSA")

denying her claim for Social Security Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act ("the Act").  *See* 42 U.S.C. § 423.  The parties have

consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C.

§ 636(c).  For the reasons that follow, Claimant's request for summary judgment (Dkt.

13) is granted and the Commissioner's request for summary judgment (Dkt. 20) is

denied.  This matter is remanded to the SSA for further proceedings.

## I.      BACKGROUND

### A.      Procedural History

Claimant filed a T2 DIB application on March 7, 2011 alleging an onset date of

January 28, 2009 due to lupus, arthritis, chronic obstructive pulmonary disease

("COPD"), neuropathy, and Raynaud's Disease.  (R. 13, 174.)  The application was

denied initially and upon reconsideration.  (R. 80-81.)  After both denials, Claimant filed

a hearing request on October 12, 2011 pursuant to 20 C.F.R. § 404.929 *et seq,*, which was scheduled on October 26, 2012 before an Administrative Law Judge ("ALJ").  (R. 45-79, 93-94.)  Claimant appeared at that hearing along with her representative.  (*Id.*)  A Vocational Expert ("VE") was also present to offer her testimony.  (*Id.*)  On December 5, 2012, the ALJ issued a written decision finding Claimant not disabled and denying her DIB application.  (R. 8-24.)  The Appeals Council denied Claimant's request for review, (R. 1-6), and this action followed.

B.   **Medical Evidence**

1.   **Treating Physicians**

Medical records indicate that Claimant has been a patient of Franciscan Hammond Clinic Specialty Center ("Hammond Clinic") since August 20, 2009.  (R. 457.) She first visited Hammond Clinic for complaints of lightheadedness and "hearing pulse" in the right ear.  (*Id.*)  A physical exam revealed normal results.  (R. 457, 460.)  She returned to Hammond Clinic on September 3, 2009 for a follow-up examination and x-rays, which yielded mostly normal results except for mildly hyper-inflated lungs and showed a prior fusion of the lower cervical spine.  (R. 449-50.)  Claimant returned on September 10, 2009 due to abnormal EKG results.  (R. 444.)  Her EKG results were discussed and further testing was ordered.  (R. 447.)  A cardiac stress test was performed returning normal results.  (R. 425, 443.)  Claimant returned to Hammond Clinic on multiple occasions through January 2010 for routine exams and medication refills.  (R. 385, 389, 396, 403.)

On March 3, 2010, Claimant returned to Hammond Clinic due to complaints of bilateral knee, hip, and elbow pain, as well as neck pain.  (R. 377.)  A physical and

musculoskeletal exam returned normal findings and she had full range of motion in all joints.  (R. 379.)  Radiographs of her cervical spine showed that the cervical fusion remained intact; there was some foraminal narrowing visible in certain areas of the cervical spine.  (R. 367.)  Claimant returned on March 24, 2010 due to the same complaints of pain and was prescribed Plaquenil, a medication used to treat lupus.  (R. 365.)  Claimant returned in May 2010 and was prescribed Lidoderm patches for her pain and instructed to take Ibuprofen.  (R. 348, 350.)  Claimant returned to Hammond Clinic in October 2010 and January 2011 for follow-up consultation on her lupus.  (R. 314-24.)  It was noted that Claimant was doing well; she had joint pains, but they were controlled by Ibuprofen and Tramadol.  (R. 322.)  On July 22, 2011, Claimant was diagnosed with Raynaud's disease.  (R. 295.)  On December 7, 2011, a MRI of Claimant's cervical spine was performed and indicated some degenerative changes with minimal disc bulging at certain areas.  (R. 581.)  Claimant returned to Hammond Clinic throughout 2011 due to complaints of hand numbness, twitching, and various pains.  (R. 518, 523, 529, 535.)  On December 20, 2011, it was noted that a September 2011 EMG exam showed that Claimant had mild right Carpal Tunnel Syndrome ("CTS").  (R. 512.)

On February 20, 2012, Claimant visited Midwest Interventional Spine Specialists for aching in the right side of her neck down to the arms and hands.  (R. 475.)  She rated her pain between six and eight on a ten-point scale.  (R. 478.)  Claimant further stated that her pain interferes with her sleep habits and social activities.  (R. 480.)  The pain increased when she stands, walks, lifts, or is stressed.  (*Id.*)  She was found to have cervical spinal stenosis.  (R. 476.)  Claimant returned on March 22, 2012 for neck

pain, and numbness and tingling in her right arm and hand.  (R. 469.)  Again, she was
found to have cervical spinal stenosis.  (*Id.*)

On March 8, 2012, Claimant received a cervical epidural steroid injection in her
lumbar spine.  (R. 473.)  On August 24, 2012, Claimant presented herself to Franciscan
Physicians Hospital ("Franciscan") due to pain in the neck and right arm.  (R. 590.)  The
attending physician noted that Claimant agreed to proceed with a cervical epidural
steroid injection.  (R. 591.)  On August 28, 2012, she was admitted to Franciscan for her
steroid injection.  (R. 588.)  It was noted that Claimant tolerated the procedure well and
she remained stable throughout.  (R. 589.)

### 2. Agency Physicians

On May 25, 2011, Christine Kieffer of the Bureau of Disability Determination
Services ("DDS") conducted a psychological examination of Claimant.  (R. 253-56.)  Ms.
Kieffer opined that Claimant had symptoms of depression including insomnia, increased
appetite, social withdrawal, crying spells, irritability, and anger.  (R. 254.)  Ms. Kieffer
further opined that Claimant's capacity for attention was mildly impaired and her
capacity for concentration was markedly impaired.  (*Id.*)  Ms. Kieffer concluded that
Claimant displayed symptoms of adjustment disorder with mixed anxiety and
depression.  (R. 255.)

On the same day, Dr. Liana Palacci of DDS conducted an internal medicine
consultative examination.  (R. 248-51.)  Dr. Palacci's physical examination yielded
generally normal results.  (R. 249-50.)  She found that Claimant had well-controlled
lupus which was currently treated with medication, well-controlled COPD, and
complaints of neck pain after surgery.  (R. 251.)

On June 8, 2011, Donald Henson completed a Psychiatric Review Technique Form ("PRTF") for affective disorders under listing 12.04. (R. 257-70.) Mr. Henson opined that Claimant was mildly limited in the areas of activities of daily living, social functioning, concentration, persistence, and pace, and found that she did not suffer from episodes of decompensation. (R. 267.) Mr. Henson determined that Claimant was not seeing a treating source for her anxiety and found Claimant's statements regarding her limitations partially credible. (R. 269.)

On June 10, 2011, Dr. Lenore Gonzalez completed a physical Residual Functional Capacity ("RFC") assessment. (R. 271-78.) Dr. Gonzalez opined that Claimant could lift 50 pounds occasionally, 25 pounds frequently, can sit stand, and walk for about six hours in an eight-hour workday, and had unlimited ability to push or pull. (R. 272.) Dr. Gonzalez noted that in a recent medical exam, Claimant had full range of motion in all joints and spinal segments. (*Id.*) She had full grip and muscle strength and ambulated normally. (*Id.*) After reviewing the medical record, Dr. Gonzalez concluded that Claimant's statements regarding her limitations were partially credible, but that the medical evidence did not support a finding of neuropathy or Raynaud's disease. (R. 276-78.)

### C. Claimant's Testimony

At the time of the hearing, Claimant testified that she is married and lives with her husband. (R. 49-50.) She has a high-school education. (R. 51.) She has been a bank teller for the previous 15 years. (*Id.*) She testified that she became disabled on January 28, 2009 and stopped working. (*Id.*) However, she found work performing data entry at a trucking company after her alleged onset date. (*Id.*) She was fired from that

position after two weeks.  (*Id*.)  After her termination, Claimant filed for unemployment compensation and began receiving payments in 2009 and continued to receive unemployment for two years.  (R. 52.)  She attempted to look for other work but was unable to find a job.  (*Id*.)

Claimant further testified that while working as a bank teller, she began to make mistakes because of her health problems, specifically pain in her neck, hands, and arms.  (R. 53-54.)  She takes pain medication including Vicodin and Cymbalta but stated that they do not completely relieve the pain though they help.  (R. 55.)  However, she stated that her medication makes her drowsy.  (*Id*.)  Claimant testified that while on medication, she is able to cook and straighten out the house though she is still not capable of heavy work.  (*Id*.)  When she is not carrying out minor chores, she requires about one to two periods of rest.  (R. 56.)  Claimant testified that she goes to the grocery store at least three times a week.  (R. 68.)  She receives assistance loading and carrying her groceries.  (*Id*.)  Claimant stated that her husband will assist her with the chores and the cooking.  (R. 61.)

Claimant testified that she has severe pain in her lower back which was never formally diagnosed with an MRI.  (R. 58.)  She also has pain in her ankles and testified that a doctor informed her that she may have lupus.  (*Id*.)  She further stated that she has dizzy spells about once or twice a week that last up to ten minutes.  (R. 64.)  Claimant testified to having difficulties using her hands because she experiences swelling.  (R. 65.)  She has difficulty typing, opening jars or bottles, and chopping.  (R. 65-66.)  Claimant also testified that she has trouble sleeping and only sleeps a total of

six hours per night.  (R. 70.)  She testified that her anxiety causes her to lose sleep and experience crying spells.  (R. 70-71.)

### D.    VE's Testimony

The VE classified Claimant's past relevant work as a teller as light exertional work.  (R. 75.)  The ALJ asked the VE whether an individual who is limited to medium exertional demands, and has to avoid exposure to poorly ventilated areas, chemicals, and environmental irritants such as fumes, odors, dust, and gases, would be able to perform the demands of Claimant's past relevant work.  (*Id.*)  The VE answered affirmatively.  (*Id.*)  The VE further testified that if the hypothetical individual were limited to light exertional demands, she would be able to perform the demands of Claimant's past work as well.  (*Id.*)  The ALJ further limited the hypothetical individual to occasional interaction with the public, coworkers and supervisors, and the VE stated that she would be unable to perform Claimant's former job because occasional contact with supervisors and the public is necessary to perform that job.  (*Id.*)  The VE further opined that Claimant does have transferrable skills to perform the duties of a bank vault teller, but only if she could perform work at the medium exertional level.  (R. 76.)

When asked by Claimant's attorney representative whether an individual would be able to perform Claimant's former job if limited to frequent but not constant reaching, handling, and fingering, the VE opined that she would be unable to perform her former job.  (R. 77.)  The VE further opined that if Claimant were to be off-task for 15 percent of the workday due to marked difficulties in concentration, she would not be employable in any occupation.  (*Id.*)

### E.    The ALJ's Decision

On December 5, 2012, the ALJ issued a written opinion denying Claimant's DIB application. (R. 8-24.) As an initial matter, the ALJ determined that Claimant met the insured status requirement of the Act through June 30, 2014. (R. 13.) At step one, the ALJ found that Claimant has not engaged in Substantial Gainful Activity ("SGA") since her alleged onset date of January 28, 2009. (*Id.*) At step two, the ALJ found that Claimant had the severe impairments of lupus, COPD, cervical spine abnormalities, and mild right CTS. (*Id.*) At step three, the ALJ determined that Claimant's impairments did not meet or medically equal the severity of the listed impairments as found in 20 C.F.R. Part 404, Subpart P, App'x 1. (R. 17.) Before step four, the ALJ found that Claimant had the RFC to perform light work with avoidance of concentrated exposure to pulmonary irritants such as dust, gas, fumes, odors, chemicals, and poorly ventilated areas. (R. 18.) At step four, the ALJ determined that Claimant is capable of performing her past relevant work as a teller because that position does not require the performance of work-related activities precluded by her RFC. (R. 23.)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

Because the Appeals Council denied review on May 29, 2014, the ALJ's findings constitute the final decision of the agency. (R. 1-3); *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994). The findings of the ALJ as to any fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002); 42 U.S.C. § 1383 ("The final determination of the Commissioner after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final

determinations under section 405 of this title.")  Although the court affords great deference to the ALJ's determination, it must do more than merely rubber stamp the ALJ's decision.  *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986).  In order to affirm the ALJ's decision, the court must find the decision to be supported by substantial evidence on the record as a whole, and must take into account whatever in the record fairly detracts from its weight.  *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).  Substantial evidence is more than a mere scintilla; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Kepple v. Massanari,* 268 F.3d 513, 516 (7th Cir. 2001) citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court may not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.  *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that determination falls upon the ALJ, not the courts.  *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).  But an ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the court may afford the claimant meaningful review of the ALJ's ultimate findings.  *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).  It is not enough that the record contains evidence to support the ALJ's decision and the court must remand if the ALJ does not rationally and sufficiently articulate the grounds for that decision, so as to prevent meaningful review.  (*Id.*)

**B.** **Analysis under the Social Security Act**

To qualify for Social Security benefits, a claimant must be under a disability within the meaning of the Act. *See* 42 U.S.C. § 423(a)(1)(E). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002). Pursuant to the Act, Claimant is disabled only if her physical or mental impairments are of such severity that she is unable to do her previous work and cannot, when "considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work." 42 U.S.C. § 423(d)(2)(A). Another agency requirement to receive disability insurance benefits is that Claimant must show she was disabled on or before the date her insured status expired. *See* 20 C.F.R. § 404.130 for definition of insured status; *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process for determining whether Claimant is disabled. *See* 20 C.F.R. § 404.1520(a). This five-step sequential evaluation process requires the ALJ to inquire:

1.      Is Claimant presently engaging SGA? *See* 20 C.F.R. § 404.1572 *et seq.*

2.      Does Claimant have a severe medically determinable physical or mental impairment that interferes with work and is expected to last at least 12 months?

3.      Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  *See* 20 C.F.R. § Pt. 404, Subpt. I, App. 1.

4.      Is Claimant unable to perform her former occupation?

5.      Is Claimant unable to perform any other work?

20 C.F.R. § 404.1520(a)(4); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).  A negative answer at any point, other than step three, ends the inquiry and leads to a determination that Claimant is not disabled.  *Zalewski v. Heckler*, 760 F.2d 160, 162 n. 2 (7th Cir. 1985).  Claimant has the burden of establishing steps one through four.  At step five the burden shifts to the Commissioner to establish that Claimant is capable of performing work.  *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## III.    DISCUSSION

In challenging the ALJ's opinion, Claimant brings three arguments.  First, Claimant contends that the ALJ erred in his RFC assessment because he did not consider all of Claimant's impairments.  The second argument presented falls along the same vein except that Claimant argues that the ALJ did not properly account for the limitations stemming from her mental impairment.  Finally, Claimant challenges the ALJ's credibility assessment.

### A.    RFC Assessment

Claimant presents several reasons as to why the ALJ did not account for all of her limitations in the RFC.  First, Claimant argues that the ALJ did not consider her CTS and the resulting limitations in her hands.  (Pl. Mot. at 4.)  The ALJ considered Claimant's mild right CTS to be a severe impairment at step two, but found that the evidence did not support further limitations in the RFC because diagnostic tests "only

11

showed mild right [CTS] and no evidence of large or small fiber neuropathy."[1]  (R. 13, 22.)  The ALJ also determined that Claimant did not have "further limitation in using the right arm and hand even in light of [CTS]."  (R. 22.)  However, the ALJ's analysis is deficient here because he did not sufficiently articulate how he concluded that Claimant's CTS did not further limit her work capacity.

The ALJ seems to have found that Claimant's mild form of CTS did not restrict her to the degree of being unable to work, but medical evidence does in fact document the difficulties that she has had with her CTS.  Medical notes from Hammond Clinic from September 2011 through December 2011 document that Claimant has been feeling hand numbness and tingling for a few years with worsening symptoms for the previous year.  (R. 512, 529, 535.)  Not only does she "wake up at night to shake her hands," it was also noted that she "tends to drop object[s]."  (*Id.*)  An EMG taken on September 29, 2011 indicated that Claimant suffered from mild CTS.  (R. 586.)  In other encounters at Hammond Clinic on March 20, 2012 and July 17, 2012, the attending physician noted that she had trouble opening a jar due to her numbness.  (R. 488, 505.)  Despite these findings, the ALJ emphasized "that Claimant did not allege any extraordinary measures for addressing the arm and hand complaints."  (R. 22.)  But the ALJ "must not draw any inferences" about Claimant's condition from a failure to seek a course of treatment unless the ALJ has explored Claimant's explanations as to the lack of medical care. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

Moreover, the ALJ seems to have found the lack of evidence of large or small fiber neuropathy to completely undermine Claimant's CTS diagnosis.  But the ALJ failed

---

[1] *Neuropathy,* Dorland's Medical Dictionary (32nd ed. 2014), A functional disturbance or pathological change in the peripheral nervous system

to explain the correlation between the two or why a lack of evidence for one would necessarily weaken the diagnosis of another to the point that there can be no limitations attributable to the CTS. When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," and here the ALJ's conclusion that Claimant was not further limited by her CTS is unsupported by the record. *Clifford*, 227 F.3d 863 at 872; *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Second, Claimant contends that the ALJ did not factor any limitations in standing and walking. (Pl. Mot. at 6.) In his written opinion, the ALJ determined that "the normal extremities exams and normal gait warrants no limitations on standing, walking, and sitting." (R. 22.) To support his findings, the ALJ referenced the DDS internal medicine consultative examination performed on May 25, 2011 in which her musculoskeletal exam returned normal findings and her gait was normal as well. (R. 250.) He also noted the normal gait and physical findings of Dr. Zachariah of the Hammond Clinic on March 3, 2010. (R. 378-79.) However, in other parts of the medical records, Claimant's struggle with her pain is well documented. In a later March 24, 2010 visit where Claimant complained of knee, hip, elbow, and neck pains, Dr. Zachariah prescribed Plaquenil, generally used to treat lupus or arthritis, to alleviate her symptoms. (R. 365.) In a later visit on May 5, 2010, Claimant was diagnosed with Systemic Lupus Erythematosus ("SLE"). (R. 349.) Medical records from follow-up appointments at Hammond Clinic indicate that Claimant often complained of pain "all over" and "feel[ing] numb in arms and legs." (R. 511, 523.) She was prescribed hydrocodone for pain control as well. (R. 495.)

Further, during the hearing, Claimant testified that her lower back pains and knee pains have been problematic for a year. (R. 58.) She also testified that she requires a lot of rest during the day due to her pain and that her husband assists her a lot with the household chores. (R. 60-61, 67.) Though this evidence was available, the ALJ did not acknowledge it. And while an ALJ need not mention every piece of evidence, again, he must build a logical bridge from the evidence to his conclusion. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ did not do so here. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.)

The ALJ believed that he accommodated for Claimant's limitations due to her cervical spine impairment, lupus, and CTS by restricting her to light work with certain environmental limitations. The Commissioner argues that this was sufficient. (Def. Mot. at 6.) However, as defined by the regulations, light work entails a standing and walking requirement for up to six hours a day. *See DeFrancesco v. Bowen*, 867 F.2d 1040, 1043 (7th Cir. 1989) (The full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday); *see also* SSR 83-10 * 6 (S.S.A.), 1983 WL 31251. Moreover, 20 C.F.R. § 404.1567(b) provides the definition for light work: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg

controls." *See also Pepper*, 712 F.3d 351 at 362. Understanding what light work entailed, the ALJ nevertheless determined that Claimant could perform work at this level despite her documented leg and knee pains. On remand, the ALJ should carefully re-assess Claimant's RFC, taking into account all the evidence of record.

### B.    Mental Impairments

Next, Claimant argues that the ALJ did not properly consider the limitations arising from her mental impairments. (Pl. Mot. at 8.) Treatment notes from DDS clinical psychologist Ms. Kieffer on May 25, 2011 indicate that Claimant faced difficulties with depression, adjustment disorder, and anxiety which impaired her concentration. (R. 254-55.) Though the ALJ acknowledged Ms. Kieffer's finding of Claimant's "marked limitation" in concentration, he gave this medical opinion little weight "in light of the complete absence of any such documentation of objective clinical concentration deficits by the treating sources at the clinic." (R. 15-16.) Moreover, the ALJ gave more weight to another agency psychological exam conducted by Dr. Palacci in which Claimant's mental status was found to be normal and she noted no limitations or abnormalities in concentration. (R. 16-17, 250-51.) Claimant disagrees with the ALJ's use of a single normal psychological examination to justify his findings when she was found to have marked impairment in concentration in another psychological examination. The court agrees.

First, the ALJ improperly discredited Ms. Kieffer's medical opinion because an ALJ may not base his decision solely on the lack of objective evidence. *See* 20 C.F.R. § 404.1529(c); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) *citing Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). Moreover, if the ALJ found inconsistencies

in the medical opinions, he should have minimally articulated the perceived inconsistencies. *See Townsend v. Barnhart*, 28 F. App'x 531, 538 (7th Cir. 2002). The ALJ failed to do so here.

Claimant further argues that even if the ALJ was correct in that she had only mild limitations in concentration, persistence, and pace, she should have accounted for all limitations. This argument is without merit however. With regard to concentration, persistence, and pace, the Seventh Circuit has cautioned the courts to take care in considering when an individual is moderately limited in those areas. In the case of Claimant, if her limitations in these areas are again in fact determined to be mild, there is no steadfast requirement that an ALJ factor these limitations in his findings. *See Richards v. Astrue*, 370 F. App'x 727, 730 (7th Cir. 2010) *citing* 20 C.F.R. § 404.1520a(d)(1) (If there are no episodes of decompensation and the rating in each of the first three categories is none or mild, the impairment generally is not considered severe and the claimant thus is not disabled.).

Nonetheless, it is worth noting that an ability to engage in "activities of daily living" (with only mild limitations) need not translate into an ability to work full time. *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010). Here, the ALJ concluded that Claimant could return to her past work because the work of a bank teller does not require the performance of work-related activities precluded by her RFC. However, this logic fails. An ALJ can conclude that a claimant is capable of returning to her former work, but the ALJ is "required to determine the physical demands of the particular type of sedentary work that this claimant had done and then compare those demands to her

present capabilities." *See Dodd v. Shalala*, 46 F.3d 1133 (7th Cir. 1994). The ALJ did not do so here.

At step two, the ALJ determined that Claimant's CTS was a severe impairment. Claimant testified at the hearing that the pain in her hands causes her to drop items. (R. 66.) And yet, despite Claimant's testimony and the ALJ's own findings, he concluded in his written opinion that Claimant would be able to perform her former job as a bank teller. As Claimant correctly points out, the job of a bank teller requires the handling of money and also, along the lines of her mental abilities, concentration to keep records. *See* United States. Dept. of Labor. Employment and Training Administration. (1977). Dictionary of Occupational Titles. 4th ed. United States. Dept. of Labor,1991. Retrieved from http://www.oalj.dol.gov/libdot.htm (Bank Teller: Receives and pays out money, and keeps records of money and negotiable instruments involved in financial transactions.) The ALJ failed to explain how Claimant, who suffers from CTS and issues with concentration, may successfully perform this job. Moreover, Claimant testified at the hearing that due to her impairments, she made "big mistakes" in her former bank teller job, including a $10,000 and a $1,000 bank error, which led her to her termination. (R. 52-53.) The ALJ did not consider her testimony, which undercuts his determination that Claimant can return to her past work. *Clifford*, 227 F.3d 863 at 872 (While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision.)

## C. Credibility Determination

Finally, Claimant argues that the ALJ erred in his credibility determination. (Pl. Mot. at 11.) The ALJ gave several reasons for why he found Claimant incredible,

including the fact that she collected unemployment benefits while she began searching for other employment. While it is permissible for the ALJ to give some consideration to the collection of unemployment when assessing credibility, *see Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005), as Claimant correctly argues, the Seventh Circuit has cautioned that "attributing a lack of credibility to [applying for and receiving unemployment benefits] is a step that must be taken with significant care and circumspection…[and] [a]ll of the surrounding facts must be carefully considered." *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014); *see also Richards*, 370 F. App'x 727 at 732 ("Although we have noted that a claimant's representations in seeking unemployment benefits may be relevant in assessing the credibility of her representations to the SSA, [Claimant] testified that she sought unemployment benefits only because she had no other source of income. A desperate person might force herself to work-or in this case, certify that she is able to work-but that does not necessarily mean she is not disabled.") (internal citation omitted). During the hearing, while Claimant testified that she received unemployment benefits, the ALJ made no attempt to explore her financial situation. The ALJ simply asked whether she filed for unemployment, whether she received it, and how long she received it for. (R. 52.) However, there was evidence of financial difficulty, since Claimant testified that her husband lost his previous job and is attending medical treatment for prostate cancer. (R. 61.)

The ALJ also seems to have found Claimant's attempt to look for employment fatal to her credibility. But this reasoning is flawed. As Claimant testified, she never received a phone call from potential employers and was never successful at securing a

job.  *See Bartell v. Cohen*, 445 F.2d 80, 82 (7th Cir. 1971) (reasoning that a claimant's attempts to find a job were relevant only to her motivation and not to whether she was, in fact, disabled).  It is possible that Claimant sought a job without understanding the true nature of her condition, only to discover later that her attempt to work is unsuccessful due to her disabilities "or [s]he might work only an hour or two a day; or receive gratuitous or charitable employment."  *Heldenbrand v. Chater*, 132 F.3d 36 (7th Cir. 1997).

Claimant also challenges the ALJ's use of her daily activities, such as reading, watching television, driving a car, going for walks, and attending family gatherings, to justify his finding that Claimant's allegations regarding her limitations were not credible. The Commissioner argues that Claimant's daily activities indicate that she has a greater functional ability than she alleges.  (Def. Mot. at 5.)  It is axiomatic that an ALJ may consider a claimant's daily activities when assessing credibility, *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007), but the ALJ must explain perceived inconsistencies between a claimant's activities and the medical evidence.  *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).  Minimal daily activities such as preparing simple meals, weekly grocery shopping, and taking care of family members do not establish that a person is capable of engaging in substantial physical activity.  *See Clifford*, 227 F.3d 863 at 872.

In this case, the ALJ considered Claimant's daily activities as substantial evidence that she was not suffering from disabling pain and was not limited as her allegations suggested.  Specifically, the ALJ determined that "medical records and her daily activities do not support a need for a nap, or limited lifting, sitting, or standing."  (R.

22.)  But the fact that no doctor opined that Claimant would require naps throughout the day, or that she would be limited in her physical capabilities, should not be construed as her being able to perform full-time work and therefore not disabled.  Moreover, while the ALJ places much emphasis on the "fair level" of activities of daily living, he did not consider aspects of Claimant's hearing testimony that seem to suggest limitations in her activities of daily living.  For example, Claimant testified that she receives help from her husband when cooking daily meals and "straightening up" the house.  (R. 61.)  While the ALJ focused on her ability to perform household chores, Claimant testified that performing household chores aggravates her pain symptoms, such as her neck pain.  (R. 69.)  She also testified that though she can go grocery shopping, she relies on the shopping cart to prop herself up and is unable to go through the store without it.  (R. 68.)  While Claimant did perform a wide array of daily activities, her testimony suggests that she did not perform these tasks independently, and the court would be hard-pressed to rely simply on her daily activities to conclude that she can engage in SGA.  The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons and is not held to a minimum standard of performance, as she would be by an employer.  *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

In sum, remand is necessary for the ALJ to correct the various errors in his opinion.  The court notes that on remand, the ALJ should conduct a symptoms evaluation pursuant to the new SSR 16-3P (S.S.A.), 2016 WL 1119029.  Though the term "credibility" has been removed from the regulations following SSR 16-3p (which superseded the previous SSR 96-7p), the new SSR still requires the ALJ to consider

familiar factors in evaluating a claimant's symptoms of pain such as testimony, objective medical treatment, medication and its side effects, etc.

## IV.    CONCLUSION

For the aforementioned reasons, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied.  The case is remanded for further proceedings consistent with this opinion.  It is so ordered.

**Michael T. Mason**
**United States Magistrate Judge**

**Dated: June 14, 2016**